## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ARCHER WESTERN CONTRACTORS, LLC  :
                                           :
                                           :
       v.                                 :   Civil No. CCB-14-3031
                                           :
                                           :
SYNALLOY FABRICATION, LLC, et al.  :
                                           :

## MEMORANDUM

Archer Western Contractors, LLC ("Archer Western") filed this suit against Synalloy Fabrication, LLC ("Synalloy") and Travelers Casualty & Surety Company of America ("Travelers") seeking damages for Synalloy's purported breach of contract.  (Compl., ECF No. 1; Am. Compl., ECF No. 23).  Synalloy filed a counterclaim requesting (1) a declaratory judgment that no contract arose from the purchase order, (2) an order requiring Archer Western to return a performance bond, and (3) a finding of unjust enrichment.  (Answer and Countercl. 14–15, ECF No. 8).  Currently pending before the court are Archer Western's motion for partial summary judgment, (Pl.'s Mot. Partial Summ. J., ECF No. 39), and Synalloy and Travelers' joint motion for summary judgment.  (Defs.' Mot. Summ. J., ECF No. 44).  The court finds oral argument unnecessary to resolve the issues.  *See* Local R. 105.6 (D. Md. 2014).  For the reasons outlined below, Archer Western's motion for partial summary judgment will be granted, and Synalloy and Travelers' joint motion for summary judgment will be denied.

## BACKGROUND

The plaintiff, Archer Western, is the general contractor for Baltimore City's Sanitary Contract No. 877, which pertains to renovations at the Back River Wastewater Treatment Plant

("the project"). (Pl.'s Mot. Partial Summ. J., Ex. 1, Lippert Aff. ¶ 3, ECF No. 39-3).  Relevant

here, the project required Archer Western to provide piping for two facilities: Activated Sludge

Plant 2 and Activated Sludge Plant 3. *Id.* ¶¶ 5, 7.  Each Activated Sludge Plant contains six

reactor tanks.[1]

In anticipation of receiving this contract, Archer Western solicited quotes for fabrication

of steel piping.  On June 12, 2013, Synalloy submitted a quotation of $7,850,000.  (Defs.' Mot.

Summ. J., Ex. 4, Letter Dated June 12, 2013, ECF No. 44-7).  The quotation was a proposal to

"furnish, fabricate and deliver" stainless steel piping in accordance with drawings provided by

Archer Western.  In particular, the quotation noted that "[s]cope of supply shall be per the

enclosed highlighted drawing[s]." *Id.*  The drawings portrayed the piping requirements of two

reactor tanks: one in Activated Sludge Plant 2 and one in Activated Sludge Plant 3. (Defs.'

Reply, Ex. 3, Construction Drawings, ECF No. 46-5).  Each drawing had a title box in the lower

right-hand corner, labeled "Typical Reactor Modifications," which referenced the specific

Activated Sludge Plant in which that reactor tank was located.  *Id.*  Next to the title box on some

of the drawings was a visual key, specifying which portion of the six reactors in that particular

plant was portrayed in the drawing.  *Id.*

On the same day Synalloy transmitted this quote, another fabrication company, Felker

Brothers Corp., was named as the apparent low bidder for the piping subcontract.  (Defs.' Mot.

Summ. J., Ex. 8, Kulling Dep. 46:10-12, ECF No. 44-11).  It appears, however, that Felker had

left out certain materials in pricing its quote.  *Id.* at 27:8-21; 36:2-21.  The exact sequence of

events following the receipt of the Felker and Synalloy bids is unclear from the parties' filings;

however, as of June 21, 2013, Archer Western and Synalloy were corresponding regarding the

---

[1] The terms basin and reactor tank are used synonymously throughout the parties' filings and
correspondence.

piping requirements and adjustments to Synalloy's quoted price.  (Defs.' Mot. Summ. J., Ex. 10, Email Dated June 21, 2013, ECF No. 44-13).  As a result of these discussions, Synalloy transmitted a revised quotation to Archer Western on July 12, 2013, with a quoted price of $6,750,000. (Defs.' Mot. Summ. J., Ex. 11, Email Dated July 12, 2013, ECF No. 44-14).  This document included the same language pertaining to scope as Synalloy's original quotation letter. *Id.*

The parties continued to communicate regarding the scope of the project.  (Kulling Dep. 55:17–56:23, ECF No. 44-11).  Representatives from Synalloy and Archer Western met on August 1, 2013, and August 8, 2013, to discuss details of the proposed subcontract.  (Defs.' Mot. Summ. J., Ex. 5, Tidlow Dep. 82:9-87:17, ECF No. 44-8).  The parties disagree, and cite conflicting deposition testimony, as to whether these meetings included a discussion of the number of reactor tanks covered by the proposed subcontract.  (Defs.' Mot. Summ. J., Ex. 12, Robinson Dep. 87:18–88:10, ECF No. 44-15; Pl.'s Reply, Ex. 17, Markhardt Dep. 179:25–181:3, ECF No. 45-17).

Following these meetings, Archer Western transmitted a letter of intent to Synalloy. (Defs.' Mot. Summ. J., Ex. 14, Letter of Intent, ECF No. 44-17).  The letter indicated Archer Western's intent to enter into a purchase order agreement with Synalloy.  It describes the scope of the project as "Fabrication & Delivery of Stainless Steel Piping as outlined on your drawings sent to Archer Western on 8/8/2013," followed by a list of drawings identical to those listed in Synalloy's quotation.  *Id.*  The next paragraph states that "The Reactor Tanks will be typical of 6 each basins at Reactor Tanks 2 & 3.  Synalloy will provide Victaulic Coupling on all SST Flushing Water pipe and Spay [sic] Water Pipe."  *Id.*  The letter further authorized Synalloy to

"complete the submittals and shop drawings, and schedule of values in accordance with the contract documents." *Id.*

On August 28, 2013, Archer Western sent Synalloy a purchase order for fabrication of piping and related materials in accordance with its letter of intent. (Pl.'s Mot. Partial Summ. J., Ex. 6, Purchase Order, ECF No. 39-8). The purchase order included numerous exhibits and addenda, including Exhibit B, which outlined the scope of work for the project. Exhibit B also stated that "The Reactor Tanks will be typical of 6 each basins at Reactor Tanks 2 & 3." *Id.*

On October 7, 2013, Synalloy responded with a letter to Archer Western and a signed copy of the purchase order. (Defs.' Mot. Summ. J., Ex. 16, Letter Dated Oct. 7, 2013, ECF No. 44-19). In relevant part, the letter stated, "We acknowledge and accept your Purchase Order Number 213097P05 based on the attached exceptions and clarifications." *Id.* In addition to the letter and purchase order, Synalloy transmitted two documents titled "General Conditions of this Quotation" and "Exceptions and Clarifications to Purchase Order Number 213097P05." *Id.*[2] The letter and purchase order were signed by Carolyn Webb, Synalloy's Director of Customer Service. Next to Ms. Webb's signature on the purchase order is the handwritten notation "see Ack Letter w/ Exceptions." *Id.* There was a space on the purchase order for a signature by David B. Casey, a Senior Vice President at Archer Western; however, neither Mr. Casey, nor any other representative from Archer Western, signed the purchase order.

From October 7, 2013, until February 11, 2014, the parties continued to discuss and exchange revisions to Synalloy's proposed "exceptions and clarifications." (Defs.' Mot. Summ. J., Ex. 7, Markhardt Dep. 100:1–117:11, ECF No. 44-10; Defs.' Mot. Summ. J., Ex. 20, Email Dated Dec. 13, 2013, ECF No. 44-23; Defs.' Mot. Summ. J., Ex. 21, Email Dated Jan. 23, 2014,

---

[2] None of Synalloy's exceptions or clarifications addresses the number of basins covered by the agreement.

ECF No. 44-24).  During this time period, Synalloy began work: it dedicated an employee to the

Archer Western project and prepared shop drawings and submittals per the letter of intent and

purchase order.  (Pl.'s Mot. Partial Summ. J., Ex. 3, Tidlow Dep. 179:21–180:18, 216:5–9, ECF

No. 39-5).  Additionally, Synalloy ordered raw materials and asked its manufacturer, Bristol

Metals, to begin fabricating some of the steel piping.  *Id.* at 185:1–186:7, 198:15-18.  Synalloy

also sent three blind flanges to Archer Western in December 2013.  (Pl.'s Mot. Partial Summ. J.,

Ex. 2, Tedder Aff. ¶ 8, ECF No. 39-4).

On or about October 30, 2013, Synalloy obtained performance and payment bonds from

Travelers, for which it paid $100,275.  (Pl.'s Mot. Partial Summ. J., Ex. 9, Subcontractor

Performance & Payment Bonds, ECF No. 39-11; Pl.'s Mot. Partial Summ. J., Ex. 10, BB&T -

CIC Invoice, ECF No. 39-12).  On January 25, 2014, Synalloy invoiced Archer Western for the

full cost of the bonds.  (Pl.'s Mot. Partial Summ. J., Ex. 11, Bristol Invoice, ECF No. 39-13).

On February 11, 2014, Dewayne Bowers, an Engineering Manager with Synalloy, sent an

email to Jeffrey Tedder, Archer Western's Assistant Project Manager for the Backwater Project.

(Pl.'s Mot. Partial Summ. J., Ex. 12, Email Dated Feb. 11, 2014, ECF No. 39-14).  In relevant

part, it said:

> There is an issue that has been brought to my attention that needs to be resolved.
> There is a note in the purchase order (213097P05) Exhibit B that states the
> following:
>
> The Reactor Tanks will be typical of 6 each basins at Reactor Tanks 2 & 3.
>
> Our quoted price includes only 2 basins.  There was not anything noted on the
> drawings that tells us that each basin is times 6.  Our price included only the
> piping actually shown on the highlighted scope drawings that we supplied, which
> are included in our bid list.

*Id.*  Mr. Tedder and Kevin Markhardt, Archer Western's Project Manager for the Backwater

Project, responded by email the same day informing Synalloy that the agreement was for 12

basins, and Archer Western expected complete performance.  (Pl.'s Mot. Partial Summ. J., Ex.

13, Tedder Email Dated Feb. 12, 2014, ECF No. 39-15; Pl.'s Mot. Partial Summ. J., Ex. 14,

Markhardt Email Dated Feb. 12, 2014, ECF No. 39-16).

      The parties then exchanged a series of correspondence in which Synalloy purported to

rescind its signature on the purchase order, Archer Western demanded performance pursuant to

the purchase order, Synalloy denied the existence of a contract and requested return of its

payment bond, and Archer Western declared Synalloy in default under the purchase order.  (Pl.'s

Mot. Partial Summ. J., Ex. 15, Email Dated Feb. 24, 2014, ECF No. 39-17; Pl.'s Mot. Partial

Summ. J., Ex. 16, Letter Dated Feb. 26, 2014, ECF No. 39-18; Pl.'s Mot. Partial Summ. J., Ex.

17, Letter Dated Feb. 27, 2014, ECF No. 39-19; Pl.'s Mot. Partial Summ. J., Ex. 18, Letter Dated

March 5, 2014, ECF No. 39-20).  On March 5, 2014, Archer Western sent a demand letter to

Travelers, requesting that Travelers fulfill its obligations under the performance bond due to

Synalloy's purported default.  (Pl.'s Mot. Partial Summ. J., Ex. 19, Letter to Travelers Dated

March 5, 2014, ECF No. 39-21).  On August 26, 2014, Travelers denied Archer Western's claim

on the performance bond.  (Pl.'s Mot. Partial Summ. J., Ex. 20, Letter Dated Aug. 26, 2014, ECF

No. 39-22).  Archer Western alleges that, as a result of Synalloy's breach, it had to procure

piping from another supplier, costing Archer Western "at least . . . $4,042,286.20[] in excess of

amounts that would have been paid to Synalloy for the same work under the terms of the

Purchase Order."  (Am. Compl. 9, ECF No. 23).

      Archer Western now requests summary judgment determining the following: (1) Archer

Western and Synalloy had a contract, pursuant to the purchase order, for Synalloy to furnish all

stainless steel pipe 3 inches in diameter and larger for the Back River project; (2) Exhibit B of

the purchase order set forth the scope of supply and required Synalloy to provide stainless steel

piping for twelve basins; (3) Synalloy breached its contract with Archer Western and is liable for damages arising from that breach; and (4) Travelers is liable for those damages based on Synalloy's performance bond. (Pl.'s Mot. Partial Summ. J., ECF No. 39).  Synalloy and Travelers, in turn, request summary judgment determining that no contract existed and, accordingly, neither Synalloy nor Travelers is liable for damages.  (Defs.' Mot. Summ. J., ECF No. 44; Mem. Supp. Defs.' Mot. Summ. J., ECF No. 44-2).

For the reasons that follow, the court will grant Archer Western's motion for partial summary judgment and deny Synalloy and Travelers' motion for summary judgment.

## ANALYSIS

### I.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.*  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).  In cases involving contract disputes, "summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231,

235 (4th Cir. 2007).  The court must view the evidence in the light most favorable to the

nonmovant and draw all justifiable inferences in his favor.  *Scott v. Harris*, 550 U.S. 372, 378

(2007); *see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of*

*Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013).  At the same time, the court must not yield its

obligation "to prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat*, 346 F.3d at 526 (citation and quotation marks omitted).

## II.      Choice of Law

A federal court sitting in diversity jurisdiction applies the choice of law rules applicable

in the forum state.  *See Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635

(4th Cir. 2005) (citing *Klaxon v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 496–97 (1941)).

Maryland courts, when presented with a contract containing a choice of law provision, "apply

generally the law of the specified jurisdiction."  *Cunningham v. Feinberg*, 441 Md. 310, 326

(2015).  Here, the purchase order—the written manifestation of the parties' purported

agreement—specifies that the law of the state "in which the Project is situated" shall apply to

disputes regarding the agreement.  (Purchase Order 6, ECF No. 39-8).  This provision was not

disputed by Synalloy when it accepted the purchase order; it is part of the final agreement

between the parties.  Accordingly, the court will apply Maryland law in interpreting the purchase

order.

The choice of law provision is not, however, applicable to the question of whether a

contract was formed, as application of the provision presupposes an enforceable contract.

Synalloy points out that the law of Tennessee or Georgia, rather than Maryland, most likely

applies to this question.  All three states have codified the UCC in virtually identical language;

accordingly, the court need not decide which state's law to apply.[3]  *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003) ("Choice-of-law analysis becomes necessary, however, only if the relevant laws of the different states lead to different outcomes.")

### III.     Scope of the Purchase Order

The parties dispute the scope of work required by the purchase order.  In Maryland, "[u]nder the objective theory of contracts, [courts] look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007).  Exhibit B to the purchase order provides the scope of the parties' putative contract:

> Furnish and deliver Stainless Steel Pipe and in strict accordance with all plans and specifications for the Sanitary Contract 877, Enhanced Nutrient Removal Process at the Back River Wastewater Treatment Plants as described in the following specification sections:

> 40 05 13 -entitled "Process Piping"- as it pertains to all specification requirements to furnish all Stainless Steel Piping 3 inches in diameter and greater along with couplings for the stainless steel piping associated with the flushing water and spray water for Active Sludge Plants #2 & #3.

> More specific all stainless pipe 3 inch in diameter and greater shown on contract drawings but not only limited to:

> [List of Contract Drawings]

> The Reactor Tanks will be typical of 6 each basins at Reactor Tanks 2 & 3. Synalloy will provide Victaulic Couplings on all SST Flushing Water pipe and Spray Water Pipe as shown.

> (Purchase Order, Ex. B., ECF No. 39-8)

While Archer Western could have been more artful in describing the scope of the purchase order, the only reasonable interpretation of this section is one requiring the provision of piping for all 12 reactor tanks.  The phrase following the list of drawings, "the Reactor Tanks

---

[3] The court will cite to the Maryland Code for ease of reference.

will be typical of 6 each basins at Reactor Tanks 2 & 3,"[4] is not, as Synalloy suggests, "a general, stand-alone note."  (Defs.' Reply 18, ECF No. 46).  This provision must be read in conjunction with the preceding paragraphs.  *See Cochran*, 398 Md. at 17 ("[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." (quoting *Sagner v. Glenangus Farms,* 234 Md. 156, 167 (1964))).

The phrase's clear intent was to indicate that the drawings, which specify the particular pipe and coupling requirements in two different reactor tanks, reflect the requirements of each of the twelve reactor tanks in Active Sludge Plants 2 & 3.  This interpretation is the only one consistent with the language directing Synalloy to follow certain specifications when providing "*all Stainless Steel Piping* 3 inches in diameter and greater along with couplings for the stainless steel piping associated with the flushing water and spray water *for Active Sludge Plants #2 & #3*."[5]  These phrases, read together, leave no ambiguity as to the scope of the purchase order.[6]  Synalloy was to provide all of the piping for the Active Sludge Plants; the specific piping requirements for each type of tank were specified in the contract drawings; and the contract drawings were typical of the remaining reactor tanks in each Active Sludge Plant.

---

[4] The reference to "Reactor Tanks 2 & 3" is an obvious typographical error that does not introduce ambiguity into the language of the scope section.  Numerous documents in this litigation, including the preceding paragraphs in Exhibit B, reference Active (or Activated) Sludge Plants 2 and 3. Neither party disputes this is the intended interpretation of that phrase.

[5] This interpretation is also consistent with language noting the scope was "not only limited to" the drawings.  The list of drawings does not, as Synalloy would suggest, limit the number of basins covered by the purchase order.

[6] It would stretch logic to accept Synalloy's assertions that inclusion of this phrase creates ambiguity. The letter of intent which preceded the purchase order included the same phrase, "the Reactor Tanks will be typical of 6 each basins at Reactor Tanks 2 & 3," and it was this phrase that Mr. Bowers recognized in his email as dictating a scope of twelve basins.  Further, the contract drawings incorporated into the purchase order make multiple visual and textual references to additional reactor tanks in both Active Sludge Plants.  All of these documents reflect the court's reading of the plain language in Exhibit B.

## IV.      Existence of a Contract

Synalloy contends it never formed a contract with Archer Western.  It raises this

argument both as a defense to Archer Western's motion for partial summary judgment and as the

focus of its own summary judgment motion.[7]  The disputed contract is for the sale of goods;

accordingly, it is governed by the Uniform Commercial Code (UCC).

Section 2-204 governs the formation of contracts for the sale of goods.  It provides, in

relevant part:

> A contract for sale of goods may be made in any manner sufficient to show
> agreement, including conduct by both parties which recognizes the existence of
> such a contract.

Md. Code Ann., Com. Law § 2-204(1).

This section affirms a fundamental principle of contract law: mutual assent[8] as an

essential requirement of contract formation.   Section 2-204(1) requires "an *objective*

*manifestation* of mutual assent by the parties."  *Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*,

210 F.3d 254, 258 (4th Cir. 2000) (emphasis added).  "The manifestation of mutual assent

ordinarily takes the form of an offer by one party followed by an acceptance by the other party."

*Id.* at 258–59.  In the case of contracts for the sale of goods, "the offer usually takes the form of a

purchase order."  *Id.* at 259.

---

[7] The parties also dispute whether Synalloy and Archer Western's conduct established a contract pursuant
to sections 2-204 and 2-207(3).  As the court's decision rests on an objective interpretation of the parties'
writings, it need not consider this argument.

[8] Synalloy uses the phrase "meeting of the minds" synonymously with mutual assent.  The court declines
to adopt this phrasing.  Meeting of the minds is a misnomer when referring to the requirements of the
UCC.  "Under the Code, it is sufficient if, by objective standards, there appears to be an agreement of the
parties." 2 Anderson U.C.C. § 2-204:81 (3d. ed.).  The court does not endeavor to ascertain whether the
parties had a subjective meeting of the minds.  Even if this were a requirement, the court would uphold
the contract, because any discrepancy arises from Synalloy's unilateral mistake. *See Creamer v.
Helferstay*, 294 Md. 107, 121 (1982) ("[A]bsent intentional, culpable conduct, such as fraud, duress or
undue influence, a unilateral mistake is ordinarily not a ground for relief from a contract.").

In the present case, Archer Western made an offer to contract via its purchase order of August 28, 2013.  Synalloy responded with a letter dated October 7, 2013, in which it "acknowledge[d] and accept[ed]" the August 28 purchase order "based on" certain attached "exceptions and clarifications," none of which pertained to the scope of the project.  Archer Western cites to section 2-207 of the UCC, arguing that the additional and variant terms attached to Synalloy's letter do not vitiate its otherwise valid acceptance.  Synalloy disputes Archer Western's arguments, characterizing its position as improperly interpreting section 2-207 as providing for contract formation where mutual assent is otherwise lacking.  To support its position, Synalloy cites a number of cases that required mutual assent prior to application of section 2-207.  Synalloy denies there was mutual assent because the parties were engaged in continuing negotiations, and the acceptance letter furthered those negotiations.

The court finds Synalloy's arguments unavailing.  As an initial matter, the instant dispute is not a situation, as Synalloy suggests, where the exchanged documents were simply continuing an ongoing course of negotiations.  *See, e.g.*, *Columbia Hyundai, Inc. v. Carll Hyundai, Inc.*, 326 S.C. 78, 82 (1997).  Here, the parties engaged in a series of discussions and exchanged informal correspondence covering various facets of their agreement.  It was only after these discussions concluded that Archer Western sent Synalloy a formal letter of intent followed by a purchase order—a typical formal offer in the commercial sales setting.  Synalloy responded to this overture with an acceptance letter and a signed copy of the purchase order.  Synalloy's argument that this exchange was simply part of ongoing negotiations does not comport with an objective view of the parties' formalities.[9]

---

[9] The parties' continued correspondence after Synalloy signed the purchase order is relevant only to whether additional and variant terms are incorporated into the contract pursuant to section 2-702(2)(c). Those post-acceptance discussions, standing alone, are insufficient to establish a lack of mutual assent when the writings objectively show both parties' intent to be bound.

A written offer followed by a written acceptance is the prototypical example of an objective manifestation of mutual assent. *See Audio Visual*, 210 F.3d at 258–59; Restatement (Second) of Contracts § 22(1) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.").  Additional and variant terms, even material terms,[10] in an acceptance do not *per se* eliminate this mutual assent.  The plain language of section 2-207(1) acknowledges the sufficiency of an acceptance containing additional and variant terms:

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

Md. Code Ann., Com. Law § 2-207(1).  While Synalloy is correct that a valid contract must exist before applying section 2-207 to determine its terms, section 2-207(1) permissibly informs the court's evaluation of mutual assent under section 2-204.  To hold, as Synalloy proposes, that section 2-207(1) has no bearing on the validity of an acceptance containing additional and variant terms would render that section superfluous.  The court will not adopt such a construction.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (discussing "one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'" (quoting *Hibbs v. Winn,* 542 U.S. 88, 101 (2004))).  Accordingly, so long as it was not expressly conditioned on Archer Western's assent to additional or variant terms, Synalloy's definite and seasonable expression of acceptance established the objective manifestation of mutual assent

---

[10] Synalloy also argues the material nature of these terms shows the parties lacked the necessary mutual assent.  The court does not find this argument persuasive.  To find that proposed variations of material terms vitiate a written acceptance would require the court to ignore section 2-207(2), which contemplates a valid acceptance containing additional or variant material terms.

required by section 2-204.[11]   *See Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1166 (6th Cir. 1972) ("[A] contract is recognized notwithstanding the fact that an acceptance or confirmation contains terms additional to or different from those of the offer or prior agreement, provided that the offeree's intent to accept the offer is definitely expressed, *see* Sections 2-204 and 2-206, and provided that the offeree's acceptance is not expressly conditioned on the offeror's assent to the additional or different terms.").

Synalloy further argues that its letter of October 7, 2013, constituted a counteroffer, rather than an acceptance, because it was expressly conditioned on Archer Western's assent to the attached exceptions and clarifications.   Archer Western counters that the actual language of Synalloy's letter, "We acknowledge and accept your Purchase Order . . . based on the attached exceptions and clarifications," did not expressly condition Synalloy's acceptance on Archer Western's assent to the additional and variant terms.

The court is unaware of any cases resolving the question of whether an acceptance "based on" additional terms amounts to an acceptance "expressly made conditional on [the other party's] assent" to those terms within the meaning of § 2–207(1).   This court previously considered a similar issue regarding an acceptance "subject to" additional terms. *See MHD-Rockland Inc. v. Aerospace Distributors Inc.*, Civil No. CCB-13-2442, 2014 WL 31677, at *4 (D. Md. Jan. 3, 2014).   In *MHD-Rockland*, the court looked to the reasoning of "[o]ther courts interpreting similar language in acknowledgement forms" and found the "subject to" language did not "make the acceptance expressly conditional on the buyer's assent to the additional terms." *Id.*   The court

---

[11] Synalloy's assertion that section 2-207 only applies to the Battle of the Forms also misses the mark. The statute's authors contemplated the battle of the forms as only one of the "typical situations" to which it would apply.   Further, nothing in the plain text of the statute itself supports adopting such a narrow approach.

finds those same cases[12] persuasive as to the effect of Synalloy's "based on" language, and holds that Synalloy's acceptance of Archer Western's purchase order was not expressly conditional on Archer Western's assent to the additional and variant terms.[13]

Synalloy also argues that the "General Terms of this Quotation" form attached to the acceptance letter rendered its acceptance conditional on Archer Western's assent to the additional and variant terms. The first paragraph of that attached form states, "Acceptance of this offer must be made in writing and forwarded to the address on the other side hereof." (ECF No. 44, Ex. 16). Nothing in this language indicates Synalloy is conditioning its acceptance on Archer Western's assent to the additional and variant terms. Indeed, this appears to be a form letter intended to accompany an original price quotation, rather than a demand for assent to new terms. Paragraph 11, which Synalloy cites in support of its position, evidences this interpretation of the document: "It is expressly agreed our quotation covers our offer completely . . . ." *Id.* Synalloy did not transmit a quotation with its October 7 letter. Paragraph 2 of the form also shows this was simply a general form not aimed at conditioning Synalloy's acceptance: "Prices quoted are firm for thirty days only, unless otherwise stated herein." *Id.* Synalloy was not quoting new prices in its acceptance letter. The language in the "General Terms of this Quotation" cannot reasonably be interpreted as converting Synalloy's acceptance into a counter offer.

---

[12] *See, e.g.*, *Luria Bros. & Co., Inc. v. Pielet Bros. Scrap Iron & Metal, Inc.*, 600 F.2d 103, 113 n. 12 (7th Cir.1979) (interpreting UCC); *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1167–68 (6th Cir.1972) (same); *Stemcor USA, Inc. v. Trident Steel Corp.*, 471 F. Supp. 2d 362, 368–69 (S.D.N.Y.2006) (applying New York law); *AEL Indus., Inc. v. Loral Fairchild Corp.*, 882 F. Supp. 1477, 1485 (E.D. Pa.1995) (same); *Gardner Zemke Co. v. Dunham Bush, Inc.*, 850 P.2d 319, 323–24 (N.M.1993) (applying New Mexico law).

[13] For the same reasons, the language accompanying Carolyn Webb's signature, "see Ack Letter w/ Exceptions," will not be interpreted as expressly conditioning Synalloy's acceptance on Archer Western's assent to additional and variant terms.

For the foregoing reasons, the court holds that a contract was formed between Synalloy and Archer Western.  Its terms are those contained in the Purchase Order.[14]

### V.        Breach of Contract

While Synalloy disputes the existence and scope of the contract, it admits that it stopped performance and did not deliver fabricated piping for twelve basins.  This failure to perform constituted a breach of the contract.  Archer Western's motion for summary judgment will be granted as to Synalloy's breach of contract.

Travelers, as surety for Synalloy's performance bond, is liable for Synalloy's breach pursuant to paragraph 6 of the Subcontractor Performance Bond.  (Subcontractor Performance Bond ¶ 6, ECF No. 39-11).  Accordingly, Archer Western's motion for summary judgment as to Travelers' liability will be granted.

### CONCLUSION

For the foregoing reasons, the court will grant Archer Western's motion for partial summary judgment as to the existence of the contract, Synalloy's breach, and Synalloy and Travelers' liability for that breach.  The court will deny Synalloy and Travelers' motion for summary judgment for the same reasons.


A separate order follows.


  3/11/16                                                                   /S/                                 
Date                                                                 Catherine C. Blake
                                                                     United States District Judge

---

[14] As Synalloy's proposed additional and variant terms have no bearing on the issues raised in the parties' motions for summary judgment, the court need not decide whether they were incorporated into the contract.